AO 240 (1/94)

**E-FILED**

Thursday, 28 December, 2006 02:26:25 PM
Clerk, U.S. District Court, ILCD

# United States District Court

## DISTRICT OF

**FILED**

DEC 2 8 2006

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

Plaintiff

V.

Defendant

**APPLICATION TO PROCEED
WITHOUT PREPAYMENT OF
FEES AND AFFIDAVIT**

CASE NUMBER: 06-2243

I, _James Delso_ declare that I am the (check appropriate box)

☒ petitioner/plaintiff/movant ☐ other

in the above-entitled proceeding; that in support of my request to proceed without prepayment of fees or costs under 28 USC. §1915 I declare that I am unable to pay the costs of these proceedings and that I am entitled to the relief sought in the complaint/petition/motion.

In support of this application, I answer the following questions under penalty of perjury:

1. Are you currently incarcerated?: ☒ Yes ☐ No (If "No" go to Part 2)

   If "Yes" state the place of your incarceration _Illinois River Correctional Center_

   Are you employed at the institution? _Yes_ Do you receive any payment from the institution? _Yes_

   Have the institution fill out the Certificate portion of this affidavit and attach a ledger sheet from the institution(s) of your incarceration showing at least the past **six** months' transactions. _No_

2. Are you currently employed? ☒ Yes ☐ No

   a. If the answer is "Yes" state the amount of your take-home salary or wages and pay period and give the name and address of your employer. _Between $100.00 to $200.00 dollars a month_ _Employer John Dudek_

   b. if the answer is "No" state the date of your last employment, the amount of your take-home salary or wages and pay period and the name and address of your last employer.

3. In the past 12 twelve months have your received any money from any of the following sources?

   a. Business, profession or other self-employment ☐ Yes ☒ No
   b. Rent payments, interest or dividends ☐ Yes ☒ No
   c. Pensions, annuities or life insurance payments ☐ Yes ☒ No
   d. Disability or workers compensation payments ☐ Yes ☒ No
   e. Gifts or inheritances ☐ Yes ☒ No
   f. Any other sources ☐ Yes ☒ No

   If the answer to any of the above is "Yes" describe each source of money and state the amount received **and** what you expect you will continue to receive.

If "Yes" state the total amount. _Mutual Fund ' 250.00_

5.  Do you own any real estate, stocks, bonds, securities, other financial instruments, automobiles or other valuable property?    ☐ Yes    ☒ No

If "Yes" describe the property and state its value.

6.  List the persons who are dependent on you for support, state your relationship to each person and indicate how much you contribute to their support.  _None_

I declare under penalty of perjury that the above information is true and correct.

_12-22-06_
**DATE**

_Mario Orlo_
**SIGNATURE OF APPLICANT**

# CERTIFICATE

(Incarcerated applicants only)
(To be completed by the institution of incarceration)

I certify that the applicant named herein has the sum of $ _____ on account to his/her

credit at (name of institution) _____ . I further certify

that the applicant has the following securities to his/her credit: _____

_____ . I further certify that during the past six months the applicant's

average balance was $ _____ .

_____    _____
**DATE**                         **SIGNATURE OF AUTHORIZED OFFICER**

AO 241 (Rev 5/85)

PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| **United States District Court** | District _Central District of Illinois_ |
|---|---|

| Name _James Delso_ | Prisoner No. _B-35965_ | Case No. _94-CF-421_ |
|---|---|---|

| Place of Confinement _Illinois River Correctional Center    06-2243_ |
|---|

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| James Delso | v. Warden Randolph |

The Attorney General of the State of:  _Lisa Madigan_

## PETITION

1. Name and location of court which entered the judgment of conviction under attack _Circuit Court of the Sixth Judicial Circuit, Decatur, Macon County, Illinois 62523_

2. Date of judgment of conviction _Aug. 31, 1994_

3. Length of sentence _20 yrs._

4. Nature of offense involved (all counts) _Attempt First Degree Murder three (3) Counts_

5. What was your plea? (Check one)
   (a) Not guilty □
   (b) Guilty ☒
   (c) Nolo contendere □
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details: _Guilty plea to one (1) count of Attempt first degree murder and two (2) counts dismissed_

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury □
   (b) Judge only □

7. Did you testify at the trial?
   Yes □ No ☒

8. Did you appeal from the judgment of conviction?
   Yes □ No ☒

AO 241 (Rev. 5/85)

9. If you did appeal, answer the following:

(a) Name of court _____

(b) Result_____

(c) Date of result and citation, if known _____

(d) Grounds raised _____

_____

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

(1) Name of court _____

(2) Result _____

_____

(3) Date of result and citation, if known _____

(4) Grounds raised _____

_____

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

(1) Name of court _____

(2) Result _____

_____

(3) Date of result and citation, if known _____

(4) Grounds raised _____

_____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes ☒ No ☐

11. If your answer to 10 was "yes," give the following information:

(a) (1) Name of court _Macon County, Circuit Court of the Sixth Judicial Circuit_

(2) Nature of proceeding _Post-conviction filed Feb. 26, 1997_

_____

(3) Grounds raised _Denial of effective assistance of counsel and due process_
_when attorney coerced and tricked defendant into pleading guilty_

AO 241 (Rev. 5/85)

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐  No ☒

(5) Result _dismissed as frivolous and patently without merit_

(6) Date of result _March 27, 1997_

(b) As to any second petition, application or motion give the same information:

(1) Name of court _Macon County, Circuit Court Sixth Judicial Circuit_

(2) Nature of proceeding _Post-conviction filed March 4, 1999_

(3) Grounds raised _Denial of due process and effective assistance of counsel_
_when his guilty plea was not a constitutional valid waiver._

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐  No ☒

(5) Result _denied_

(6) Date of result _March 9, 1999_

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

(1) First petition, etc.      Yes ☒   No ☐
(2) Second petition, etc.     Yes ☐   No ☒
(3) Third petition, etc.      Yes ☒

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_On the second petition defendant appeal to the Appellate Court but after speaking_
_with the Appellate Defender, defendant decided to file a third post-conviction while_
_his second post-conviction was pending in the Appellate Court, because Appellate Defender_
_was speaking about filing a frivley brief._

12. State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.

CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

(4)

same information:

(1) Name of court: Macon County, Circuit Court Sixth Judicial
Circuit

(2) Nature of proceeding: Post-conviction Filed Aug.17,2000
(3)Grounds raised: (a) attorney finney coerced defendant into
pleading guilty; (b)Finney failed to interview or investigate
witnesses that could prove defendant innocent; (c)Finney failed
to impeach the state's witnesses regarding prior inconsistent
statements; (d)the state's attorney misrepresented the facts in
the factual basis; (e)Finney failed to correct the state's
attorney concerning the factual basis; (f)the state's attorney
failed to disclose exculpatory evidence to the court; (g)Finney
failed to file a motion to withdraw guilty plea and a Rule 604(d)
certificate; (h)Finney was representing a conflict of interest;
(i)Finney personal problems prevented him from preparing a
defense; also the Amended petition alleged (a)Defendant's guilty
plea and/or sentence are void or otherwise defective by reason of
the trial court's failure to comply with Rule 402(a)(2) of the
Illinois Supreme Court and, consequently, defendant has been
deprived of his fundamental right to due process under the State
and Federal Constitution. Further, defendant's trial attorney
rendered ineffective assistance of counsel in his representation
of defendant with respect to sentencing issues in defendant's
case.

(4)Did you receive an evidentiary hearing on your petition. Yes
(5)Result: denied
(6)Date of result: Jan.11,2005

AO 241 (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a)  Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.
(b)  Conviction obtained by use of coerced confession.
(c)  Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.
(d)  Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
(e)  Conviction obtained by a violation of the privilege against self-incrimination.
(f)  Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.
(g)  Conviction obtained by a violation of the protection against double jeopardy.
(h)  Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.
(i)  Denial of effective assistance of counsel.
(j)  Denial of right of appeal.

A. Ground one: ___Denial of effective assistance of counsel when trial___
___attorney failed to correct the state's attorney in the factual___
___basis.___

Supporting FACTS (state *briefly* without citing cases or law) ___Defendant contends that___
___attorney Finney should have objected to the state's attorney___
___factual basis when Mr. Current stated on page 6, of the guilty___
___plea hearing "that some of those employees at the mall would___
___identify defendant as being with the group of males". Attorney___
___Finney knew that this statement the state's attorney presented___
___was flawed because these employees never stated this in there___
___statements and Finney knew this because he had the police report.___
___(see R.Vol.III. page 6 and Investigation Report)___

B. Ground two: ___Denial of effective assistance of counsel when attorney___
___Finney failed to prepare for a defense.___

Supporting FACTS (state *briefly* without citing cases or law): ___Defendant contends that___
___attorney finney had some complaints (ARDC)against him during the___
___year of 1994 when he was representing defendant. Attorney was___
___more concern about the complaints against then the case he was___
___representing. (see exhibit H) The evidence in this case 94-CF-421___
___by Mr. and Ms. Ellis was flawed and Finney knew this. Finney knew___
___that Julie Ellis stated that she didn't know who it was that was___
___shooting at them, but that one of them had a round face. (see___
___exhibit C) Attorney Finney knew that the defendant did not have a___
___round face. The evidence in the police report was enough for___
___finney to prepare for a defense. On or about Feb. or March of___
___1999, the ARDC suspended Finney law license because of the pend-___
___ing 1994 complaints. (see newspaper clipping)___

AO 241 (Rev. 5/85)

C. **Ground three:** Denial of due process when the trial court failed to comply with Supreme Court Rule 402.

**Supporting FACTS (state *briefly* without citing cases or law):** On Aug.1,1994 defendant entered into a guilty plea. However, during the admonishment the trial court failed to address to the defendant "that he has the right to plead not guilty or if the plea was made of any promise-(s). (see R.Vol.III, GUILTY PLEA TRANSCRIPT) On Aug.1,1994 attorney finney promised defendant that he would receive 8 to 10yrs. for his plead and that the sentence would be ran concurr-ent with the sentence in the pending case if convicted. On Aug.31 1994 when defendant was sentence he did not in fact receive 8 to 10yrs., nor, on Nov.14,1994 after being sentenced in the pending case was the sentences ran concurrent as Finney promised.

D. **Ground four:** Denial of effective assistance of counsel when counsel advise defendant into pleading guilty where the evidence would have shown that defendant did not commit the crime.

**Supporting FACTS (state *briefly* without citing cases or law):** In the month of June or July defendant met with attorney finney outside of the trod and finney advised defendant to plead guilty because the witnesses have picked him out of a line-up as the one who was doing the shooting. However, defendant advised Finney that he was not guilty and that the witnesses in the police report never stated that he did the shooting. Attorney Finney knew that the statement Julie Ellis gave that defendant was six feet away with a gun was not true. Finney also knew that Julie first stated to police that she didn't know who was doing the shooting, so how could she now know who was doing the shooting. (see exhibit A,B,C,D,E,F)

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them: _____

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack? Yes ☐  No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
   (a) At preliminary hearing _Attorney Seay Finney, 253 E. Wood St., Decatur, Ill._

   (b) At arraignment and plea _Attorney Seay Finney, 253 E. Wood St., Decatur, Ill._

E. Ground Five: Denial of due process right when defendant's guilty plea and/or sentence are void or otherwise defective by reason of the trial court's failure to fully advise defendant of the consequences of his plea according to Illinois Supreme Court Rule 402 (a)(2) and denial of effective assistance of counsel in counsel representation of defendant with resect to sentencing issues in the 94-CF-421 case.


Supporting Facts: Specifically, defendant contends that he had this case 94-CF-421 and pending case 94-CF-482, in the same court room with same Judge Patton and state's attorney Mr. Current. On 8-1-94 defendant plead guilty to the 94-CF-421 case while the 94-CF-482 was still pending and the trial court failed to advise defendant "that by pleading guilty this setence can be ran consecutive to any sentence you may receive in the pending case if convicted. In fact, the Court on page 3, of the guilty plead proceeding in case 94-CF-421, the court states:

●The court: Also according to the information this would be a Class X felony. That means the penalty could be a period of incarceration for not less than 6yrs. nor more than 30yrs. with a mandatory parole period of 3yrs., is that correct? Do you have any priors? Now, Mr.Current, state's attorney: Your honor, he would have to receive a full admonishment of a possible extended and consecutive. He is from Cook County. We're having trouble coming up with his true criminal history. The court: So **do you** not know what his prior history might be? Mr. Current: Not definitely. We have an idea. The court: If that is **the case then** we do not know what your history **would be, the** possible penalty for Class X is not less than 6yrs. nor more than 30yrs. with a parole period or if there is a possibility of an extended term, that would be not less than 30yrs. nor more than 60yrs. witn **the** same parole period. Do you understand what the minimum and maximum penalties would be for the offense?   see R.VOL. III

    Now, Mr. Current, himself brought out the fact that because of the pendency of the other case pending in this court defendant would have to receive a consecutive setencing admonishment. Defendant did not, in fact, receive that possible consecutive setencing admonishment. Defendant was not immediately sentenced after the plea. It wasn't until 30dys. later when defendant was sentenced. During that period defendant could have been admonished of the possibility of consecutive sentence on Aug.31,1994 during the sentencing in this case 94-CF-421.


Ground Six: Denial of effective assistance of counsel when attorney failed to file a motion to withdraw guilty plea and a Illinois Supreme Court Rule 604(d) certificate.


Supporting Facts: On Aug.31,1994, defendant advised attorney Finney to file a motion to withdraw guilty plea. Attorney ..... advise the defendant that he will file a motion. However, on Oct. 24,1994, a status hearing was held before the Honorable Jerry

Patron, judge presiding and state's attorney Mr. Current and the
following occurred:

Mr. Current: At this time the People would object to
proceeding any further. There is no written **motion to** reduce
sentence filed before the **trial court within thirty days. We**
would suggest this court has no jurisdiction concerning the
defendant's sentence. The court: Mr. Finney? Mr. Finney: I think
there is a motion in the file, isn't there? The court: I don't
have one. Mr. Finney: There is no motion in the file. The court:
The last docket entry that I show as to this defendant indicates
representation that defense counsel has tendered a motion to
reduce. Defense counsel directed to file the original with the
Court. That is alloted for today at 8:30, but I don't see the
original in the file. Mr. Finney: It was filed sometime ago,
Judge. I will check with the clerk. I will raise it as the proper
way. We don't have anything on file. See Report of Proceeding,
Status Hearing, page 2

Here defendant's attorney did not file a motion to withdraw
or a motion to reduce sentence. Attorney Finney, himself stated
that "we don't have anything on file."

GROUND SEVENS: Denial of due process when the states attorney
misrepresented the facts of the factual basis.

Supporting facts; Defendant states that during the guilty
plea hearing on Aug.1,1994, states attorney Mr. Current
presented the factual basis stating; that emplotees (witnesses
working inside the mall, and the evidence would show that some
of these employees would identify the defendant as one of the
person who had left with a large group of males that had followed
Mr. Ellis out of the theatre. see exhibit R.Vol.III,A 5,A#6

Defendant contends that thios latter evidence was not true because
no witnesses ever stated in there statements that the defendant
was with the group of males. See exhibit A,B,C,D Also see up
to date statements of these same witnesses that investigator
Michael Tarczan. See Investigation Report

68

Supporting Facts: Defendant contends that in the police invest-
igation report there were eight witnesses whom attorney finney
was aware of that the State intended to call and testify against
defendant. None of these witnesses stated that defendant was with
the group of males or the one who was doing the shooting. However
these witnesses gave the description of several other subjects by
the names Mike Muse, Andrea, and Lamont, even another witness by
the name Mario Manns gave the name of Mike Muse. These witnesses
could have proven that defendant did not commit this crime. There
was no physical evidence linking defendant to the crime other
than Julie and Montaro Ellis stating that defendant was 6ft. away
when he was doing the shooting. But these two witness previous
made several other statements saying that they didn't know who
was doing the shooting. see exhibits A,B,C,D,E,and F

Ground Nine: Denial of effective assistance of counsel when
counsel failed to impeach state witnesses regarding there prior
inconsistent statements.

Supporting Facts: That on 5-9-94, Julie Ellis stated that she
stayed in the car while Montaro went into the theatre to get
Mario Manns and that she didn't know who it was that was shooting
at them, but that one of them had a round face. (see exhibit E)
Julie also stated that Montaro had problems at the pool hall with
a subject known to her as Mike Muse. (see exhibit E) But on 5-8-
94 Julie was shown six photos of b/m subjects and included in the
line-up were the photos of defendant, Marcus Moore, and Mike
Muse. She looked at the photos briefly and pointed to the photo
of defendant. (see exhibit G) Julie first stated that she didn't
know who it was that was shooting at them. Then she stated that
the person had a round face, which defendant does not have, but
after she reviewed the photos briefly she pointed to defendant
but not Mike Muse and stated that this is the subject Montaro
always have problems with.

Ground Ten: Denial of due process when the state's attorney
failed to disclose exculpatory evidence to the court.

Supporting Facts: On Aug.1,1994, defendant made an open plea and
went before the court for sentence. However, doing the sentencing
the state's attorney was to present the factual basis of evidence
that would find defendant guilty. There were eight to nine wit-
nesses in the state's attorney factual basis which the state
stated that they will testify that defendant was with the group
of males. Unfornately, these witnesses never stated this. (see
exhibit A,B,C,D,)    Also the state's attorney never mention to
the court that Julie and Montaro Ellis made several statements
and those statements never mentioned defendant as the shooter or
with the group of males.

Ground Eleven: Denial of effective assistance of counsel when counsel was representing a conflict of interest.

Supporting Facts: Defendant contends that between the month of May the 8th or 9th of 1994, attorney finney was appointed to represent him in case no.94-CF-421 and 94-CF-482. On or between May or June of 1994 attorney finney was appointed to represent Alvin Louis, a witness against the defendant in case no.94-CF-482. The State maintains that Finney argued the conflict of interest in a motion to withdraw on Aug.30,1994, but this motion did not come until after Finney entered defendant into a guilty plea on Aug.1,1994 in case no.94-CF-421. Finney started representing Alvin Louis in the month of May or June and he knew that he was representing a conflict at this time so he should have presented a motion to withdraw then and not before he entered defendant into a guilty plea. Finney, himself stated that he spoke with this said witness his status as an informant, without knowing which case he was so acting. (see Motion to Withdraw) Attorney Finney waited until two months later after he entered defendant into a guilty plea to say that he was representing a conflict. The damage was done that he did to defendant.

6 D

(c)  At trial _____

(d)  At sentencing  *Attorney Jenny Finney, 253 E. Wood St., Decatur, Ill.*

(e)  On appeal _____

(f)  In any post-conviction proceeding  *Joseph W. Vigneri, 136 W. Washington St. Decatur, Ill.*

(g)  On appeal from any adverse ruling in a post-conviction proceeding  *Susan M. Wilham, Appellate Defender, 400 West Maine St. Suite 303, P.O. Box 5240, Springfield, Ill.*

16.  Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ☐   No ☒

17.  Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☒   No ☐
(a)  If so, give name and location of court which imposed sentence to be served in the future:  *Macon County Circuit Court, Sixth Judicial Circuit*

(b)  Give date and length of the above sentence:  *Nar. 14, 1998   33 year sentence*

_____

(c)  Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☒   No ☐

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on

*12-14-06*
_____
(date)

*James Oslon*
_____
Signature of Petitioner

RECEIVED
5TH DISTRICT MT. VERNON, IL
JUN 0 5 1997
MAILED 6-4-97
OTHER

IN THE CIRCUIT COURT

FOR THE SIXTH JUDICIAL CIRCUIT

DECATUR, MACON COUNTY, ILLINOIS

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | NO. 94-CF-423 |
| JAMES L. DELSO, | ) ) ) | |
| Defendant. | ) ) ) | |

REPORT OF PROCEEDINGS

BE IT REMEMBERED, and CERTIFIED, that on, to wit:

the 1st day of August, 1994, the following proceedings were held

in the aforesaid cause before The Honorable JERRY L. PATTON,

Circuit Judge presiding.

APPEARANCES:          RICHARD CURRENT & SCOTT RUETER
                      Assistant State's Attorneys
                      In behalf of the People

                      JERRY FINNEY
                      Public Defender
                      In behalf of the Defendant

                      Report of Proceedings by:
                      Robin A. Steadman, C.S.R.,
                      Official Court Reporter
                      Sixth Judicial Circuit of Illinois
                      253 E. Wood St.
                      Room 208
                      Decatur, IL  62523

C.S.R. #084-002704

                      Plea of Guilty

R. VOL. III

A1

5-97-0209

FILED
JUN 0 5 1997
LOUIS E. COSTA
CLERK APPELLATE COURT 5th DIST.

JUL 1995
FILED
Kathy A. Holt
Circuit Clerk

1    (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT:)

2         THE COURT:   94-CF-421, People vs. James Delso.   Show

3    the People present by Mr. Rueter.   The Defendant is present in

4    the custody of the Macon County Sheriff and with counsel, Mr.

5    Finney.   What is the status?

6         MR. FINNEY:   Your Honor, at this time, we're prepared

7    to enter into a negotiated plea to Count I.

8         THE COURT:   Mr. Delso, Count I charges you with the

9    offense of attempted first degree murder on May 8, 1994 in Macon

10   County.   It alleges that you, with the intent to commit the

11   offense of first degree murder, performed a substantial step

12   towards the commission of that offense, in that you, without

13   lawful justification, and with the intent to kill Montaro Ellis,

14   shot a handgun at Montaro Ellis.   Do you understand what the

15   allegation is?

16        MR. DELSO:   Yes.

17        THE COURT:   Pardon?

18        MR. DELSO:   Yes.

19        THE COURT:   Are you, at this time, offering to enter

20   a plea of guilty to that charge?

21        MR. DELSO:   Yes.

22        THE COURT:   Are you doing this of your own free will?

23        MR. DELSO:   Yes.

24        THE COURT:   Has anyone forced you or threatened and

25                                                              2

A2

1    said you must plead guilty?

2            MR. DELSO:  No.

3            THE COURT:  Do you understand if you enter a plea of

4    guilty, you are giving up several rights.  You are giving up

5    your right to a trial by the Court or by the jury; you are

6    giving up your right to cross-examine the witnesses who might

7    testify against you; you are giving up your right to subpoena

8    witnesses in to testify for you, and you are giving up your

9    right against self-incrimination.  Do you understand, if you

10   plead guilty, you are giving up all those rights, and we would

11   not have a trial of any type?

12           MR. DELSO:  Yes.

13           THE COURT:  Also, according to the information, this

14   would be a Class X Felony.  That means the penalty could be a

15   period of incarceration for not less than six years nor more

16   than thirty years with a mandatory parole period of three years;

17   is that correct?  Does he have any priors?

18           MR. CURRENT:  Your Honor, he would have to receive a

19   full admonishment of a possible extended and consecutive.  He is

20   from Cook County.  We are having trouble coming up with his true

21   criminal history.

22           THE COURT:  So, you don't know what his prior history

23   might be?

24           MR. CURRENT:  Not definitely.  We have an idea.

25                                                    3

A3

1          THE COURT: If that is the case then, we do not know

2    what your history would be.  The possible penalty for a Class X

3    is not less than six nor more than thirty with a three-year

4    parole period, or if there is a possibility of an extended term,

5    that would be not less than thirty, nor more than sixty with the

6    same parole period.  Do you understand what the minimum and

7    maximum penalties could be for the offense?

8          MR. DELSO:  Yes.

9          THE COURT:  Do you have any questions?

10         MR. DELSO:  No.

11         THE COURT:  Again, are you entering the plea of

12   guilty of your own free will?

13         MR. DELSO:  Yes.

14         THE COURT:  Is there a factual basis?

15         MR. RUETER:  Yes, sir, Your Honor.

16         MR. CURRENT:  Your Honor, the evidence would show

17   that on Sunday, May the 8th of 1994 at approximately 10:50 p.m.,

18   the Hickory Point Six Theaters, located in Forsyth, Macon

19   County, Illinois was open for business.  They were showing a

20   number of movies.  The evidence would show that a Montaro Ellis

21   went to the theater in order to talk to a Mario Manns who had

22   called him and asked him to give him a ride home.  Mr. Montaro

23   Ellis would testify he was allowed entrance into the theater in

24   order to check on Mario Manns.  Once inside the theater, he was

25                                                              4

A4

1  told by Mario Manns he had his problem solved, and he no longer
2  needed a ride.  The evidence would then show that Montaro Ellis
3  left the theater.  Shortly upon leaving the theater, a large
4  group of black males, approximately ten or so, left the theater
5  right after Mr. Ellis.  Mr. Ellis had left his car parked on the
6  east parking lot of the theaters.  It would be located east and
7  slightly south of the main doors on the south side of the
8  roadway that encircles the mall.  Left in the car were his wife,
9  Julie Ellis, and Julie Ellis has a three-year old daughter,
10 Shayla.

11        The evidence would show that Mr. Ellis approached his
12 vehicle, which was parked facing north when Julie started
13 yelling out that there were men, there were men with guns, a
14 number of men with guns, that had appeared and were pointing
15 guns at them.  Montaro Ellis got in the car, slammed it in
16 reverse.  The evidence would show that the front passenger side
17 window of the car was shot out.  The evidence would show that on
18 the rear of the automobile that a brake light slightly to the
19 left of the license plate, a bullet entered through that light,
20 went clear through the frame, and a fragment of a bullet was
21 found on a blanket which was resting in the hatch back area of
22 the car.  The car drove off.  Mr. Rueter will tell the Court
23 what the evidence would be concerning Montaro Ellis and Julie
24 Ellis.  There were a large number of employees working inside
25                                                          5

A5

1  the mall, and the evidence would show that some of those
2  employees would identify the Defendant as one of the persons who
3  had left with a large group of black males that had followed Mr.
4  Ellis out of the theater.  The evidence would also show that an
5  automobile was identified leaving or chasing the automobile
6  driven by the Ellises.  There were three different automobiles
7  that left after the Ellises in pursuit.  One of those was a dark
8  blue or green Malibu Chevrolet station wagon.  The people at the
9  theater and parking lot would identify that automobile as being
10 one of the automobiles that fled after the shooting.

11      The evidence would show that after midnight, which
12 would turn out to be May the 9th, sometime around one o'clock in
13 the morning, this same automobile, a blue-green Chevrolet Malibu
14 station wagon was stopped in Decatur, Illinois.  There were
15 three people in the car.  In the back seat passenger was the
16 Defendant, James Delso.  James Delso was interviewed by police
17 officers.  Deputy Paul Dudra interviewed him, and the Defendant
18 said that his nickname was Wham, and he also told the police
19 officer that he was a member of the Vice Lords street gang.
20 Montaro Ellis would testify that he was a former member of the
21 Vice Lords street gang, and that he had switched street gangs
22 and was then a member of the Gangster Disciples street gang at
23 the time of the shooting.  The People would call Police Officer
24 Carl Carpenter.  We believe he would be qualified as an expert

25                                                        6

A6

1   in gangs.  He has, on prior occasions, testified as an expert
2   witness on the subject of gangs.  He would testify at the time
3   of the shooting, there was an animosity between rival street
4   gangs, being one rival street gang the Vice Lords and another
5   rival street gang, the Gangster Disciples.  He would also
6   testify as an expert witness the dangers and the repercussions
7   of one gang member switching to another gang.  He would indicate
8   that it is very common for one street gang member once he
9   abandons a gang and joins another gang to be subject to
10  retribution.  Mr. Rueter will supply the rest of the factual
11  basis.

12              THE COURT:  Mr. Rueter.

13              MR. RUETER:  As to what Julie Ellis and Montaro Ellis
14  saw as they were leaving the theater area, Your Honor, on the
15  date alleged in the information, witnesses would testify,
16  specifically Julie Ellis would testify that while she was
17  waiting in her car for her husband to return from the theater,
18  she saw him come out, and soon behind him saw a group of
19  individuals exit the theater.  She would testify that as her
20  husband got to the car, she saw about three or four of the
21  individuals from this large group with firearms and that they
22  were approaching the car as her husband was getting in, at which
23  point, she started screaming and telling him that he was being
24  followed by men with guns.  She would testify that her husband

25                                                               7

$A7$

1  got in the car and began to start the car. She was trying to
2  assist him getting off the parking brake, and when she looked
3  up, outside of the windshield while the car was still parked
4  facing north, she saw the Defendant, who was the closest of
5  these three or four individuals to the vehicle, with a firearm
6  pointed directly at the front windshield of the vehicle.

7         Evidence would show from her testimony that at that
8  time she saw the Defendant's finger pull the trigger on the gun,
9  but the gun did not go off, but at that point, he bent down and
10 started to play with butt end of the pistol of the firearm which
11 would appear to her to be a semi-automatic weapon. She would
12 testify that at that point, they were able to back the car up
13 and started to pull forward away from the parking space. At
14 that point again, she saw the Defendant point the gun, saw his
15 arm jerk, and the windshield of the passenger side she was on
16 shattered. Evidence would show that at that point they drove
17 away. As they were driving away, they heard several more
18 gunshots, including the sound of one bullet hitting the back of
19 the car. Montaro Ellis would testify that as he got into the
20 car, he didn't really look up because he was trying to get the
21 car started. And at one point, the car died, and when the car
22 died, he had begun to look up as he was trying to get it
23 started, saw the Defendant, and then got back to trying to get
24 the car started, and at that point didn't really look back

25                                                                 8

A 8

1  anymore at the time after they drove off.  Evidence would also

2  show that both Montaro Ellis and Julie Ellis picked the

3  Defendant out of a line-up when it was held several days later,

4  after also identifying the Defendant from a photo line-up.

5        MR. CURRENT:  I believe as a supplement, Your Honor,

6  at the time of the shooting, a three-year old child was sitting

7  in the front seat with Julie Ellis.  And at the time of the

8  shooting, Hickory Point Six Theaters were open for business.

9  Movies were showing, and people were parked in the parking lot.

10       THE COURT:  Show then that representation by the

11  State with regard to the factual basis.  Mr. Delso, have you

12  discussed this matter with your attorney, Mr. Finney; and do you

13  feel you understand what you are doing today?

14       MR. DELSO:  Yes.

15       THE COURT:  Do you have any questions at all that you

16  would like to ask the Court?

17       MR. DELSO:  No.

18       THE COURT:  Show then the plea of guilty.  It shall

19  be the finding of the Court that the plea has been freely and

20  voluntarily entered into.  Further, there is a factual basis for

21  the plea.  Judgment shall be entered on the plea.  Are the other

22  three counts as to this Defendant to be dismissed?

23       MR. CURRENT:  Counts II and III, Your Honor.  The

24  possession of stolen motor vehicle has not been noticed up for

25                                                               9

A9

1   trial, and it would not be dismissed, but Counts II and III

2   would have to be dismissed.

3         THE COURT:  Show then Counts II and III shall be

4   dismissed and stricken.  And do I understand correctly there are

5   no negotiations as to this particular case?

6         MR. FINNEY:  Well, there have been negotiations, but

7   there is no agreement.

8         THE COURT:  There is no agreement at this time?

9         MR. FINNEY:  Right.

10         MR. CURRENT:  That's correct.

11         THE COURT:  Show the matter shall be allotted for

12   sentencing hearing.  The Probation Office shall be ordered and

13   directed to prepare the presentence report.  Ted, would you get

14   the setting book.  Probably, it would be better to have this

15   after we finished the jury setting at the end of the month.

16         MR. CURRENT:  That would be fine because it's going

17   to take a while to communicate with Cook County on his record.

18         MR. FINNEY:  My client is not going anywhere, judge.

19   We don't really have any urgency about this, frankly.  If the

20   State wants to have it after the August setting, it wouldn't

21   bother me any.

22         THE COURT:  That's fine.

23         MR. FINNEY:  I mean, after the September setting

24   even.  That's up to them.

25                                           10

A 10

1              THE COURT:   The setting in September would be the

2    weeks of September the -- the setting in August would be the

3    weeks of August 15th and August 22nd.   Would there be any

4    conflict with say August the 31st, that's a Wednesday after the

5    jury trials are over.

6              MR. CURRENT:   That's fine with us, Your Honor.

7              MR. FINNEY:   That's fine.

8              THE COURT:   It's probably going to take sometime.   I

9    would assume the State is going to call witnesses, and the

10   Defendant is going to call witnesses?

11             MR. FINNEY:   I wouldn't think we would call much.

12             MR. CURRENT:   We haven't made up our mind if we will

13   try to prove up another crime.

14             THE COURT:   So, I should block out at least a couple

15   of hours perhaps?

16             MR. CURRENT:   At the most.

17             THE COURT:   Is there any conflict with 8:30 on that

18   day, 8:30 on the 31st?

19             MR. FINNEY:   Just that I have some post divorce

20   matters that are set that day.

21             THE COURT:   Let's make it 1:30.   We will allot it

22   for 1:30 on the 31st.

23   (WHICH WERE ALL THE PROCEEDINGS MADE OF RECORD IN SAID CAUSE ON

24   SAID DAY, AND COURT ADJOURNED.)

25                                                        11

A11

1

## CERTIFICATE

2         I, Robin A. Steadman, C.S.R., Official Court Reporter, in

3   and for the County of Macon and State of Illinois, do hereby

4   certify that the foregoing is a true and accurate Report of

5   Proceedings held in Cause Number 94-CF-421, The People of the

6   State of Illinois vs. James L. Delso.

7

8   Dated this _____ day of _____ ,1995.

9

10

11

12

13   _____
             Robin A. Steadman
14           Certified Shorthand Reporter
             Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25                                                        12

A12

1                J U D G E ' S    C E R T I F I C A T E

2          I, Jerry L. Patton, Circuit Judge, in and for the County

3     of Macon and State of Illinois, Sixth Judicial Circuit of

4     Illinois, do hereby certify that the foregoing is a true and

5     accurate Report of Proceedings held in Cause Number 94-CF-421,

6     The People of the State of Illinois vs. James L. Delso.

7

8     Dated this _*17th*_ day of _July_____ ,1995.

9

10

11

12

13                                _____
                                  JERRY L. PATTON
14                                CIRCUIT JUDGE PRESIDING

15

16

17

18

19

20

21

22

23

24

25                                                          13

                                A 13

RECEIVED
CLERK APPELLATE COURT
5TH DISTRICT   MT. VERNON, IL

JUL 2 9 1997

MAILED ____7-28-97____

OTHER _____

1      IN THE CIRCUIT COURT

2      FOR THE SIXTH JUDICIAL CIRCUIT

3      DECATUR, MACON COUNTY, ILLINOIS

4   THE PEOPLE OF THE STATE OF ILLINOIS,

5              Plaintiff,                    4-05-0049

6          vs.                                    94-CF-421        FILED

7   JAMES DELSO,                                                   JUL 29 1997

8              Defendant.                                          LOUIS E. COSTA
                                                                   CLERK APPELLATE COURT 5th DIST.
9              REPORT OF PROCEEDINGS

10             BE IT REMEMBERED AND CERTIFIED, that on, to wit:  the 24th day of October,

11  1994, the following proceedings were held in the aforesaid cause before The Honorable JERRY L. PATTON,

12  Circuit Judge presiding.                                      Voh. X

13  APPEARANCES:              RICHARD CURRENT

14                            Assistant State's Attorney          FILED

15                            In behalf of the People             AUG 18 1997

16                            JERRY FINNEY                         LOUIS E. COSTA
                                                                   CLERK APPELLATE COURT 5th DIST.
17                            Public Defender

18                            In behalf of the Defendant

19   FILED                    Report of Proceedings by:

20   MAR 2 2 2005             Robin A. Steadman, C.S.R. #084-002704

21   CLERK OF THE
     APPELLATE COURT, 4TH DIST.   141 S. Main St.

22                            Decatur, IL  62523

23                            Status Hearing

24

5-94-0209 R. Vol. II

1    (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT:)

2    THE COURT:  94-CF-421, People vs. James Delso.  The People present by Mr. Current.  The

3    Defendant is present in the custody of the Macon County Sheriff and with counsel, Mr. Finney.

4    MR. CURRENT:  At this time, the People would object to proceeding any further.  There is

5    no written motion to reduce sentence filed before the trial court within thirty days.  We would suggest this Court

6    has no jurisdiction concerning the Defendant's sentence.

7    THE COURT:  Mr. Finney?

8    MR. FINNEY:  I think there is a motion in the file, isn't there?

9    THE COURT:  I don't have one.

10   MR. FINNEY:  There is no motion in the file.

11   THE COURT:  The last docket entry that I show as to this Defendant indicates representation

12   that defense counsel has tendered a motion to reduce.  Defense counsel directed to file the original with the Court.

13   That is alloted for today at 8:30, but I don't see the original in the file.

14   MR. FINNEY:  It was filed sometime ago, Judge.  I will check with the clerk.  I will raise it

15   as the proper way.  We don't have anything on file.

16   THE COURT:  Well, plus we would need you to order a copy of the proceedings.

17   MR. FINNEY:  No, not on a Motion to Reduce.  He doesn't want to withdraw his plea.

18   THE COURT:  I think it applies to both.  I think the Rule 605 applies to both a Motion to

19   Reduce and a Motion to Withdraw.

20   MR. FINNEY:  Let's check with the clerk to see what the problem is, and I will get back

21   to you.

22   THE COURT:  Show then the allotment this date shall be vacated.  If they do find it, just

23   come back and get a new date from my secretary.

24   MR. CURRENT:  May we have a return court date so this just doesn't get forgotten.

1                        MR. FINNEY:  There isn't anything on file at this point.

2                        THE COURT:  I will allot it for review as to status for November 15, 1994 at 9:00 o'clock.

3

4  (WHICH WERE ALL THE PROCEEDINGS MADE OF RECORD IN SAID CAUSE ON SAID DAY, AND

5  COURT ADJOURNED.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

4

1                           C E R T I F I C A T E

2              I, Robin A. Steadman, CERTIFIED SHORTHAND REPORTER, do hereby certify that the

3    foregoing is a true and accurate Report of Proceedings held in Cause Number 94-CF-421, The People of the State

4    of Illinois vs. James Delso.

5

6    Dated this_____day of_____1997.

7

8

9

10                          _____

11                                   ROBIN A. STEADMAN

12                              CERTIFIED SHORTHAND REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

5

| | |
|---|---|
| 1 | JUDGE'S CERTIFICATE |
| 2 | I, JERRY L. PATTON, CIRCUIT JUDGE PRESIDING, in and for the State of Illinois, |
| 3 | do hereby certify that the foregoing is a true and accurate Report of Proceedings held in Cause Number 94-CF-421, |
| 4 | The People of the State of Illinois vs. James Delso. |
| 5 | |
| 6 | |
| 7 | |
| 8 | Dated this_____day of_____1997. |
| 9 | |
| 10 | |
| 11 | |
| 12 | _____ |
| 13 | JERRY L. PATTON |
| 14 | CIRCUIT JUDGE PRESIDING |

2003-032

# INVESTIGATION REPORT
## MACON COUNTY PUBLIC DEFENDER OFFICE

Case no.    **94-CF-421**

Subject:    **James L. Delso**

Subject's
Interviewed: **Tonya M.Cumming (Angell)**
            **Crystall Warden**
            **Joe Wade**

Date:        **Dec.30,2004**

Dear Mr.Vigneri

On December 15,2004 I Made Contact With Miss Tonya Cummings By Telephone 217-428-3396.Miss Tonya Cummings Advised Me That She Is Now Married And Her New Name Is Mrs.Tonya Angell,I Asked Mrs.Angell Would She Be Willing To Talk To Me About The Shooting That took Place At The Hickory Point Theatre In Forsyth,Ill,Back On May 8th 1994,Mrs.Angell Agreed To Meet With Me The Next Day December 16,2004 At 8:00pm At Her Residence Located At 4636 East Beacon Drive Decatur,Ill.At This Meeting I Asked Mrs.Angell When The Shooting Took Place Where Was She Located,Mrs.Angell Advised Me At The Time Of The Shooting She Was Working The Front Door Selling Tickets.I Asked Mrs.Angell Was It A Busy Night For The Theatre,When She Was Working.Mrs.Angell Said No It Was A Really Slow Night And If She Could Remember Right She Only Sold Approximatly 12-15 Tickets For That Night.I Then Asked Mrs.Angell Does She Have A Pretty Good View Of The Consession Stand Located Inside The Theatre From Where She Was At,Mrs.Angell Stated Yes That The Whole Front Of The Theatre Is Different Now Than What It Was Back In 1994,And Back Then You Had A Better View Than What You Do Now.I Asked Mrs.Angell Could She Remember Who Was Working The Consession Stand That Night,Mrs.Angell Stated It's Been So Long Ago She Forgot Everybody's Name.I Asked Mrs.Angell Does She Remember The Names Crystal Warden Or A Mr.Wade.Mrs.Angell Stated No,That She Forgot All Thier Names.I Next Asked Mrs.Angell Was Thier Anyone Standing At Or Near The Consession Stand When The Shooting Took Place.Mrs.Angell Stated No,That The Lobby Was Empty When The Shooting Took Place.I Asked Mrs.Angell Was She Certain Of This, Mrs.Angell Stated Yes Because It Was Such A Slow Night.I Asked Mrs.Angell Would She Be Willing To Give Me A Written Statement Stating That,Mrs Angell Agreed And At This Point In Time I Ended My Interview And Thanked Her For Her Time.

On 12-18-04 I Made Contact With Miss Crystal Warden At Her Residence Located At

606 Allin Street,Bloomington,Ill.Phone 309-275-5023. I Asked Miss Warden Would She Be Willing To Talk To Me About The Shooting That Took Place At The Hickory Point Theatre Back On May 8,1994.Miss Warden Stated Yes.I Then Asked Miss Warden Where Was She At When The Shooting Took Place,Miss Warden Stated She Was Working Behind The Consession Stand When The Shooting Took Place And When The Shooting Started She Jumped Over The Counter And Ran To The Front Door And Locked It.I Asked Miss Warden Does She Remember If Thier Was Any Customers Inside The Lobby Or At The Consession Stand When The Shooting Took Place.Miss Warden Stated She Could'nt Say For Sure If Thier Was Anybody In The Lobby,But She Doesn't Think Thier Was,But Also Stated She Knows For A Fact That Thier Was No one At The Counter,When the Shooting Took Place.I Asked Miss Warden Was Thier Anyone Else Working Behind The Consession Counter With Her.Miss Warden Stated Thier Was But She Can't Remember Any Of Thier Names.I Asked Miss Warden Does She Remember The Names Of Tonya Cummings Or A Mr.Joe Wade.Miss Warden Stated Vaguely,But The Name Tonya Rings A Bell.I Asked Miss Warden Would She Be Willing To Give Me A Written Statement,Miss Warden Stated She Will,And At This Time I Ended My Interview And Thanked Her For Time.


On 12-17-04 I Made Contact With A Mr.Joe Wade By Telephone His Cell Number 217-433-8762 Mr.Wade Is Now A United States Marine Located At Marine Air Core Station In Beaufort,South Carolina.I Asked Mr.Wade Would He Be Willing To Talk To Me About The Shooting That Took Place At The Hickory Point Theatre Back On May 8,1994.Mr.Wade Stated He Does Not Have a Problem With It,And He Would be Glad To Help.I Asked Mr.Wade Where Was He Working In The Theatre At The time Of the Shooting,Mr.Wade Stated He Was Working Behind The Consession Counter I Asked Mr.Wade Was Thier Anyone Else Working Behind The Counter With You.Mr.Wade Stated Yes,But He Can't Remember Her Name Because It's Been A Long Time Ago.I Asked Mr.Wade Does The Names Tonya Cummings Or Crystal Warden Ring A Bell.Mr.Wade Stated Not Really,But Maybe If He Saw Them Again.I Asked Mr.Wade When The Shooting Took Place Was Thier Anyone At Or Near The Consession Counter,Mr.Wade Stated No Thier Was No one Standing At The Counter And Could Not Say For Sure If Thier Was Anybody In The Lobby When The Shooting Took Place And that If He Remembers Right Thier was A Small Group Of People Exiting The Theatre Just Moments Before Or Maybe During The Shooting.I Asked Mr.Wade Was He Certain That Thier Were no Customers At Or Near the Consession Counter.Mr.Wade Stated He Positively Can Say That Thier Was No One At The Counter,I Asked Mr.Wade Would he Be Willing To Write Me A Brief Statement Stating That And Fax It To Me As Soon As He Can,Mr.Wade Stated He Does Not Have A Problem With It,But He Would Have To Ask His Master Sergeant For Permission To Do So,Because He Is Located On A Military Base.At This Point In Time I Stated That Would Be Fine And I Ended My Interview And Thanked Mr.Wade For His Time.It Should Be Noted On December 29,2004 I Contacted Mr.Joe Wade By Telephone And Asked Him Did He Get Permission To Use The Fax Machine And Is He Still Willing To Write Me A Brief Statement.Mr Wade Stated He Forgot All About It But Will Fax Me His Statement Right Now,In Which He Did So.

**Michael Tarczan**
**Investigator**
**Macon County Public Defender Office**

2003 - 052

I Crystal Warden can state that on May 8, 1994
there was no one standing at the concession stand
at the time the shooting took took place.
And when it did take place I was on the one who
jumped over the counter to lock the doors.

Crystal Warden   12-18-04
Phil Tamm    12-18-04

2005-002

I Anya Cummings Angell recall on May 8, 1994 that no customers were in the lobby at 10:45 pm. At that time I witnessed a shooting at Hickory Point Theatre in Forsyth, Illinois.

Anya M Cummings Angell

DEC. 16, 04

DEC-30-2004 03:45 FROM:VMFH 251          253 3463          TO:2174228669          P.1/1
2003 - 052

2004/12/29

On 5/8/94  I, JOSEPH E. WADE was
WORKING At the Hickory Point Theater in the
concession stand. At the time the shooting
took place there was nobody standing at
the counter.

JOSEPH E. Wade

## MACON COUNTY SHERIFF'S DEPARTMENT
## SUPPLEMENTAL REPORT

REPORT NAME ELLIS, Montaro T.          REPORT NUMBER 9405R049
LOCATION Hickory Point Theatre         EVENT NUMBER
CLASS     Attempted Murder 3 cts.      REPORT DATE    05-08-94
ARRESTED _____         VICTIM _____

VICTIMS:
Julie ELLIS, B/F age 22
935 N. Oakland

Shayla MATHEWS, B/F age 3
935 N. Oakland

Upon arrival at the scene Dep. SCHULTHEIS brought Larry FORCE to the Theatre.
He stated that he witnessed the shooting. FORCE lives at RR#2, Box 152, Tower Hill
Il., phone number 567-3184.

FORCE stated that he and his girl friend were setting on the east end of the
parking lot, on the north side of Western Auto. He stated that saw a white foreign
type car being shot at by several black males. He stated that the veh. was a Toyota
or similar type veh. with plastic type dresser white hub caps. He stated that when
he heard the shots he and his girl friend ducked down. He stated that he thought
that he heard five to six shots fired. He stated that it sounded like a small
cal. hand gun.  FORCE stated that there was a dark, possibly blue Chevy Malibu
station wagon, with no plates on it, the year was possibly a 1978 model. He stated
there was also a dark colored Grand Prix or Buick Regal type veh. a 1978-79 model
with the left taillight out. He stated that it had grey or tan on the driver's
side door. FORCE stated that another veh. was a gold or brown Buick 4-door, 1978-80's
model, with possibly gold rims. FORCE stated that he didn't have any idea how many
occupants were in each veh. He stated that he never saw who was doing the shooting.

FORCE stated that his girl friend didn't see anything, her name is Jennifer
WYDICK. He stated that he didn't know her phone number or address.

The next witness that I talked with was Tonya M. CUMMINGS, W/F, age-21, who
lives at 3870 N. Water, phone number 877-8928, she is currently employed at the
Hickory Point Theatre.

Tonya stated that she was outside in the front of Theatre having a cigarette break,
she stated that the time was apprx. 2245 hrs. She stated that a thin black male
approached her and asked her if he could go inside to try to find his cousin Mario.
She advised him that he could.

Tonya stated that the male that approached her was thin, apprx. 5'07 and quite
possibly had a little go-tee.

Tonya stated that the subject walked out a few minutes later. She stated that
after the male came out, he was followed by apprx. ten black males coming from the
theatre, she stated that there was two females with them. She stated that someone
from the group yelled now and began firing at a white veh. which was parked just
south of theatre. Tonya stated that she wasn't sure how many shots were fired. She
stated that the group of blacks then skattered and had gotten in cars. She stated
that the only I.D. she had on any of the suspects was that one, was wearing a white
and red hooded sweat shirt.

REPORTING OFFICER Dep. A.P. Duda       I.D.  2352   DATE  05-09-94   1) WHITE-FILE
SUPERVISOR REVIEW _____

## MACON COUNTY SHERIFF'S DEPARTMENT
### SUPPLEMENTAL REPORT

REPORT NAME ELLIS, Montaro T.           REPORT NUMBER  9405R049
LOCATION Hickory Point Theatre          EVENT NUMBER
CLASS    Attempted Murder 3 cts.        REPORT DATE  05-08-94
ARRESTED                                VICTIM

The next person I interviewed was Crystal WARDEN, age-16, she is also employed
with the theatre. She was behind the snack counter at the time of the shooting. She
stated that she didn't see it, but did recognize two of the suspects with the group
of black males that came out of the theatre. She stated that one of the subjects was
a Mike MUSE, B/M age-17-18. Crystal stated that she went to MacAurther H.S. with him.
She stated that she would be able to identify him again if she saw him. She stated
that another suspect was a B/M by the name of Andrea. She stated that she believes
that he also went to Mac Aurther H.S. She stated that she was wearing a burgandy
hat with a red plastic star on it. She stated that he had a gold tooth, and wore
a large gold chain with a cronic attached. She stated that she didn't know if he
was with the group or not.

Crystal lives at 1009 W. Prairie, phone number 423-6760.

The next person I interviewed was a Joe WADE, employed with the theatre. Joe
was also behind the snack counter and didn't see the shooting. He confirmed the
description of Andrea. He stated that another person in the group was a large
black male, wearing a go-tee, and wearing a tan well worn "Kar-hard jacket.

Joe WADE is age-17, and lives at RR#1, Box 374, Maroa, phone number 794-5100.

I then talked with the Manager, Terry L. RYHERD, she lives at 197 W. Garfield,
phone number 875-4578.

Terry stated that she was up stairs at the time of the shooting, she stated that
she didn't see anything.

In the parking lot near where the shots were fired a parked car was struck with
a bullet. There was what appeared to be a bullet entry hole in the driver's door.
The plates were ran and the owner, Mike A. Douglas, 245 S. Maffit, phone number
475-0434, work 562-3951 (Essex wire, Pana Il) and came out of the theatre. He stated
that he would leave the bullet in the door for evidence. Mr. DOUGLAS stated that
he would take the panel off of the door and contact MSO for the extraction.

There was a spent 9mm casing found in the parking lot. Pictures were taken
of the bullet hole and of the casing as found. The casing was tagged with number 0160
and placed in locker #11.

After taking the information for the report I was advised by Sgt. JOHNSON that
the victim of the shooting was at the MURRELL residence, located at RR#8, box 153,
Hill Rd.

I was met by Montaro T. ELLIS and a Julie ELLIS who stated that they had been
shot at.

REPORTING OFFICER Dep. A.P. (Dudra    I.D. 2352    DATE 05-09-94    1) WHITE-FILE
SUPERVISOR REVIEW

Exhibit C

# MACON COUNTY SHERIFF'S DEPARTMENT
## SUPPLEMENTAL REPORT

REPORT NAME __ELLIS, Montaro T.__        REPORT NUMBER 9405R049
LOCATION __Hickory Point Theatre__       EVENT NUMBER _____
CLASS __Attempted Murder 3 cts.__        REPORT DATE __05-09-94__
ARRESTED _____        VICTIM _____


Montaro stated that he had received a phone call from Mario MANNS, stating that he was to come to the theatre, because he needed a ride. Montaro stated that he wasn't sure of the time, but he had left his house at about fifteen minutes after the call. He stated that he asked to go into the theatre to talk with his cousin Mario and the lady (Tonya CUMMINGS) told him that he could. He stated that when he found Mario, Mario advised him that he was OK, that he had found a ride. Montaro stated that he then left the theatre and when he had gotten outside Julie advised him that they were after him. He stated that he then got into the car and drove off.

Montaro stated that he didn't know why they were trying to kill him. He did eventually state that he was affiliated with the gang "Vice Lords" he stated at one time that he had changed gangs and that was why they were after him. Then in a later statement two me he told me that he is no longer with any gangs.

I don't fell that Montaro was being truthful to me, I feel that he is aware of who was responsible for the shooting, but quite possibly afraid to say.

Julie stated that she stayed in the car while Montaro went into the theatre to get Mario. She stated that when Montaro returned she saw several black males exit the theatre. She stated that she saw that they had guns and advised Montaro to get in the car and go, that they were after him.

Julie stated that she didn't know who it was that was shooting at them, she stated that one of the suspects had round face, and had looks similar to the person by the nick name of "Little George", she stated she didn't know Little George's name, but that it wasn't him, but someone that resembled him.

Julie stated that she had her three year old daughter in the veh. at the time of the shooting.

After taking the information I checked the veh. Montaro and Julie were driving for bullet holes. I did find one bullet hole in the left back up light, it went through to the inside of the hatch-back and a piece of the bullet was found in blanket. Also shot out was the front passenger's door glass. I couldn't find the bullet and it appears that the bullet reflected from the glass. Dep. LAWLER took polaroids along with 35mm snap shots of the hole and the broken window.


REPORTING OFFICER Dep. A.P. Pudra        I.D. __2352__    DATE __05-09-94__    1) WHITE-FILE

## MACON COUNTY SHERIFF'S DEPARTMENT
### SUPPLEMENTAL REPORT

REPORT NAME ____ELLIS, Montaro T____        REPORT NUMBER __94404464__ 9405R049
LOCATION ___Hickory Point Mall Theatre___  EVENT NUMBER
CLASS ____Attempted Murder 3 cts.____       REPORT DATE ____05-09-94____
ARRESTED _____ VICTIM

On 050994, at 00:30, I interviewed subject **Jerry R. ROUNDTREE, Jr.,** M/B, DOB: **062475,** at his residence at **#44 Carroll Drive,** Decatur, Illinois, ph. · 429-2639, in reference to what he witnessed prior to and during the incident at the Hickory Point Theaters earlier on the evening of 050894.

He stated that he is an employee of the Hickory Point Theaters, and was on duty prior to the incident.

He stated that at approximately 21:20 to 21:25, he saw ten (10) black males enter the theater building, and enter the area for the movie "No Escape". He stated that they were all walking together, and that most of them were wearing ball caps "cocked left". One subject, who he described as being 6'2" or 6'3", was wearing a red bandanna around his head.

When asked if he recognized any of these subjects, he stated "one of them", and went on to state that he recognized **"Mike Muse".** This refers to **Michael D. MUSE,** M/B, dob:061276, who is listed as a known gang member, from the Decatur Gang Listing, as being a **Black P Stone.** Last listed address for MUSE is 880 W. Elm St., Decatur.

Mr. ROUNDTREE went on to state that at the time he saw MUSE, he was dressed in **black pants, a blue,yellow, and white "Michigan" jacket, and wearing a cap cocked · to the left.**

I asked if he saw the vehicle or vehicles these subjects came in, and he stated that he first saw them after they had entered the building.

ROUNDTREE went on to state that when he finished work and left, it was approximately 22:15, that these subjects were still seated in the theater watching the movie.

At the time he walked to his car, parked on the East side of the lot, near the new construction, he noted a **dark green Olds Cutlass 2 dr,** with tinted windows, parked near his vehicle. He stated that this vehicle did not belong to any of the other employees that he knew of, and that it was possibly involved. It was not there when he came to work.

Upon officers' arrival shortly after the reported shots fired, this vehicle was not parked on the lot.

A check of LEADS and CISCO reference Michael D. MUSE revealed **two active warrants,** one for Unlawful Use of Weapons and one for Possession of a Stolen Vehicle. The address listed for the subject on the warrants is 1331 N. Union St.,Decatur.

REPORTING OFFICER _Dep. S.L.Pringle_  I.D. _2177_ DATE _05 09 94_  1) WHITE-FILE
SUPERVISOR REVIEW _____  I.D. _132.2_ DATE _5-9-94_ 2) YELLOW-INV

MACON COUNTY SHERIFF'S DEPARTMENT

SUPPLEMENT REPORT

E-FILED
Thursday, 28 December, 2006 02:30:13 PM
Clerk, U.S. District Court, ILCD

Victim: Julie Ellis                          Report# 9405R049
         Att. Murder 3cts
Offense: Agg. Discharge Firearm              Date of original
                                             Rpt. 05/08/94

Arrested: Delso, James L.

*********************************************************************

                   Montaro

   Julie advised that as she was driving out of the parking lot
the passenger side window of her vehicle exploded causing glass
to come into the vehicle. Julie and her daughter, Shayla,
received minor cuts from the broken glass.

   Julie advised that the three of them then drove to her
grandmother's residence and called MSO.

   R/O asked Julie if she had any idea as to why these subjects
were shooting at them. Julie advised that she suspects that it is
gang related and stated the following. Julie advised that Montaro
was at onetime in the Vice Lord gang, however, he changed and
became a Gangster Deciple. Advised that he has had problems with
members of the Vice Lords since the change. Julie advised that
rumors on the streets are that the Vice Lords have put a contract
out to have Montaro killed.

   Julie advised that she knows of two incidents where Montaro
had problems with Vice Lord gang members. One time was at a party
and the most recent problem was at the pool hall located in the
Colonial Mall. Advised that Montaro had problems at the pool hall
with a subject known to her as Mike Muse.

   Julie advised that her former residence located in the 1700
blk. of E. Division was broken into and it's contents destroyed
on 03/02/94. Stated that on that date she arrived home and
observed the lights on in the house. Stated that as she
approached the house she looked in and saw the damage. Stated
that she got back into her car to leave and was approached by a
B/M wearing dark clothing and carrying a handgun. Stated that the
subject ordered her from the car and when she exited it he told
her that he was going to kill her old man. Julie advised that she
called DPD and reported the damage but didn't tell them about the
B/M because she was scared.
Page:2
Command                 May 10, 1994          Det.J.Doyle #2188
Approval_____



## MACON COUNTY SHERIFF'S DEPARTMENT
### SUPPLEMENT REPORT

Victim: Julie Ellis                          Report#  9405R049
          Att. Murder 3cts
Offense: Agg. Discharge Firearm              Date of original
                                             Rpt.  05/08/94

Arrested: Delso, James L.

*********************************************************************

Ellis advised that since the incident he has talked to Mario
Mann. Mann advised him that he had seen Mike Muse in the group of
subjects at the movie and also a subject he knows as Lamont. Mann
advised Ellis that the above two subjects were with the others in
the movie.

R/O asked Ellis if he knows either of these subjects. He
advised that he has had problems with the Muse subject since the
gang change. Advised that Muse has tried to start fights with
him in the past since the change.

R/O concluded the interview with Ellis at that time.


Page:3

Command              May 13, 1994        Det.J.Doyle #2188
Approval_____

MACON COUNTY SHERIFF'S DEPARTMENT

SUPPLEMENT REPORT



Victim: Julie Ellis                          Report# 9405R049

        Att. Murder 3cts

Offense: Agg. Discharge Firearm              Date of original

                                             Rpt. 05/08/94

Arrested: Delso, James L.

*******************************************************************

R/O then had Julie look at two 6 person line-ups consisting of
B/M subjects having the same basic characteristics. Included in
the line-ups were the photos of James L. Delso, Marcus Moore and
Mike Muse.

Julie looked at the line-up briefly and pointed to the photo
of James Delso advising that he was the subject that was shooting
at the car from the 6ft. distance. Julie further advised that he
was also the subject that was at her residence on 03/02/94 and
told her that he was going to kill her old man. R/O asked Julie
if she was positive and she stated she was.

R/O concluded the interview with Julie at that time and asked
her to have Montaro contact me.

Page:3

Command              May 10, 1994        Det.J.Doyle #2188
Approval_____

**E-FILED**
Thursday, 28 December, 2006 02:30:24 PM
Clerk, U.S. District Court, ILCD

BEFORE THE HEARING BOARD
OF THE
ILLINOIS ATTORNEY REGISTRATION
AND
DISCIPLINARY COMMISSION

In the Matter of:                          )
                                           )
JERRY FINNEY,                              )        Commission No. 96 SH *532*
                                           )
Attorney-Respondent,                       )
                                           )
No. 00811378.                              )

## COMPLAINT

Mary Robinson, Administrator of the Attorney Registration and Disciplinary Commission ("ARDC"), by her attorney Alix E. Armstead, pursuant to Supreme Court Rule 753(b), complains of Respondent, Jerry Finney, who was licensed to practice law in the State of Illinois on April 23, 1974, and alleges that Respondent has engaged in the following conduct which tends to defeat the administration of justice or bring the courts or the legal profession into disrepute.

### COUNT I

(Neglect and Misrepresentation Related to Johnathon and Ann Morgan)

1.     On or before September 7, 1993, attorney David Ellison filed, on behalf of Johnathon and Ann Morgan, a petition requesting that Johnathon Morgan be permitted to adopt Ann Morgan's biological son, Nicholas Allen Harris. The case was docketed as *Ann Marie Morgan, Johnathon Howard Morgan v. Jason Munyon, Nicholas Allen Harris*, Logan County case no. 93-F-130.

2.     On or before March 16, 1994, Johnathon and Ann Morgan discharged attorney David Ellison.

3.    On March 16, 1994, Respondent agreed to represent Johnathon and his wife, Ann Morgan, (hereafter "Morgans") in case no. 93-F-130.

4.    Respondent and the Morgans agreed that Respondent's fee would be $500.00 for his representation in case no. 93-F-130.

5.    On March 16, 1994, the Morgans tendered to Respondent $250.00, to be applied as an installment for Respondent's attorney fees.

6.    At no time after March 16, 1994 did Respondent enter his appearance in case no. 93-F-130.

7.    In June 1994, Respondent represented to the Morgans that he had entered his appearance in case 93-F-120 and was waiting for a hearing date in case no. 93-F-130.

8.    Respondent's representations to the Morgans that he had entered his appearance in case no. 93-F-130 and was awaiting a hearing date in case no. 93-F-130 were false, because at no time had Respondent entered his appearance in case no. 93-F-130, or had he otherwise requested a hearing date.

9.    Between at least February 27, 1995, and August 1, 1995, the Morgans repeatedly telephoned Respondent's office requesting a status of case no. 93-F-130.

10.    At no time between February 27, 1995 and August 1, 1995, did Respondent return the Morgans' telephone calls.

11.    On August 1, 1995, the Morgans sent Respondent a letter requesting a refund based upon Respondent's failure to provide legal services in case no. 93-F-130.

12.    On or about August 2, 1995, Respondent received the Morgans' letter described in paragraph 11 above.

2

c. 39

13. As of mid-August, 1995, Respondent had not responded to the Morgans' letter described in paragraph 12 above.

14. In mid-August, 1995, Ann Morgan met in person with Respondent, at his office, and granted Respondent two additional weeks to tender the refund.

15. At no time between mid-August and early September, 1995, did Respondent tender to the Morgans a partial or total refund.

16. In early September 1995, Ann Morgan telephoned Respondent at his office and granted Respondent an additional one week to tender the refund.

17. At no time in or after September, 1995, did Respondent tender to the Morgans any refund, or otherwise communicate with them.

18. By reason of the conduct described above, Respondent has engaged in the following misconduct:

    a.    failure to act with diligence and promptness in representing a client in violation of Rule 1.3 of the Illinois Rules of Professional Conduct (1990);

    b.    conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of Rule 8.4(a)(4) of the Illinois Rules of Professional Conduct;

    c.    failure to keep a client reasonably informed about the status of a matter in violation of Rule 1.4(a) of the Illinois Rules of Professional Conduct;

    d.    failure to earn a legal fee in violation of Rule 1.5(a) of the Illinois Rules of Professional Conduct;

    e.    failure to promptly deliver to a client or third person funds that the client or third person is entitled to receive in violation of Rule 1.15(b) of the Illinois Rules of Professional Conduct; and

3

ſ . ᴌꝹ

f.      conduct prejudicial to the administration of justice or which brings
        the courts or legal profession into disrepute in violation of Rule
        8.4(a)(5), of the Illinois Rules of Professional Conduct and Supreme
        Court Rule 771.

## COUNT II

(Neglect Related To Donald Cisco)

1.      On or about July 25, 1993, Donald M. Cisco's (hereafter "Cisco") garage business
known as the "Cisco Service Center" in Blue Mound, Illinois was burglarized.

2.      On or before November 9, 1993, Respondent agreed to represent Cisco in the
negotiation and potential litigation of an insurance claim against the Shelby Insurance Group
(hereafter "Shelby"), arising out of the incident described in paragraph 1 above. Cisco's insurance
claim was identified under Shelby claim number 48-67487.

3.      On November 9, 1993, Cisco gave Respondent various checks, bills, and receipts
of purchase that were related to the Cisco Service Center and his insurance claim against Shelby.
These documents became part of Cisco's client file and were necessary for the prosecution of
claim no. 48-67487.

4.      On or after November 9, 1993, Respondent tendered the documents described in
paragraph 3 above to Shelby for discovery purposes.

5.      On September 19, 1994, Respondent sent a written demand to Shelby for payment
in full of claim no. 48-67487. Respondent also demanded, in the alternative, a 90% settlement of
claim no. 48-67487.

6.      On September 23, 1994, Shelby sent a written rejection to Respondent's demand
letter described in paragraph 5 above. Shelby advised that they were willing to settle claim 48-

4

C.41

67487 for $11,000.00.

7.    On or about September 23, 1994, Cisco, upon Respondent's advice, rejected Shelby's offer to settle claim no. 48-67487 for $11,000.00.

8.    On or about September 23, 1994, Respondent represented to Cisco that he would engage in further settlement negotiations with Shelby, in an effort to achieve a monetary settlement amount greater than $11,000.00. Respondent also represented to Cisco that he would file a legal action against Shelby if settlement negotiations were unsuccessful.

9.    At no time after September 23, 1994, did Respondent communicate with Shelby on Cisco's behalf.

10.    At no time after September 23, 1994, did Respondent notify Cisco that he had withdrawn from negotiations with Shelby.

11.    At no time after September 23, 1994, did Respondent notify Cisco that he would not file a legal action on Cisco's behalf against Shelby.

12.    On various occasions between September 23, 1994, and July 3,1995, Cisco made repeated telephone calls to Respondent's office in an attempt to retrieve the documents described in paragraph 3 above, and to obtain the status of claim no. 48-67487.

13.    At no time between September 23, 1994, and July 3, 1995, did Respondent return Cisco's telephone calls.

14.    At all times between September 23, 1994, and July 3, 1995, Respondent knew or should have known that the documents described in paragraph 3 above were in the possession of Shelby.

15.    At no time after September 23, 1994, did Respondent make any effort to retrieve

5

C 42

the documents described in paragraph 3 above from Shelby, or inform Cisco that the documents

were in the custody of Shelby.

16.     At no time after September 23, 1994, did Respondent take any steps to preserve

Cisco's claim against Shelby.

17.     At all times relevant to the matters described herein above, Cisco's insurance

policy contained the following commercial property conditions:

> "... D. Legal Action Against Us
> No one may bring a legal action against us under this Coverage Part unless
> 1. There has been full compliance with all the terms of this Coverage Part; and
> 2. The action is brought within 2 years after the date on which the direct physical
> loss or damage occurred."

18.     On July 25, 1995, claim no. 48-67487 became time barred pursuant to the

commercial property conditions described in paragraph 17 above.

19.     By reason of the conduct described above, Respondent has engaged in the following

misconduct:

a.      failure to act with reasonable diligence and promptness in
        representing a client in violation of Rule 1.3 of the Illinois Rules of
        Professional Conduct (1990);

b.      failure to provide competent representation in violation of Rule
        1.1(a) of the Illinois Rules of Professional Conduct;

c.      failure to keep a client reasonably informed about the status of a
        matter in violation of Rule 1.4(a) of the Illinois Rules of
        Professional Conduct;

d.      failure to properly withdraw from employment until the lawyer
        has taken reasonable steps to avoid foreseeable prejudice to the
        rights of the client, in violation of Rule 1.16(d) of the Illinois
        Rules of Professional Conduct; and

e.      conduct prejudicial to the administration of justice or which

6

C 43

brings the courts or the legal profession into disrepute in violation of Rule 8.4(a)(5), of the Illinois Rules of Professional Conduct and Supreme Court Rule 771.

## COUNT III

(Neglect Related to Alice Jestis-Kim)

1.    On January 31, 1995, Respondent agreed to represent Alice Jestis-Kim (formerly "Bright" and hereafter "Jestis-Kim") in a marital dissolution.

2.    On February 2, 1995, Respondent presented to Jestis-Kim a petition for maritial dissolution for her signature. Respondent represented to Jestis-Kim that he would file the petition for marital dissolution by no later than February 3, 1995.

3.    At no time did Respondent file a petition for marital dissolution on behalf of Jestis-Kim.

4.    On February 24, 1995, Jestis-Kim's spouse, Michael Ray Bright, filed a petition for marital dissolution against Jestis-Kim. The case was docketed as *In re Marriage of Michael Ray Bright and Alice A. Bright*, Macon County case no. 95-D-113.

5.    On April 11, 1995, Respondent filed a counter-petition for dissolution of marriage on Jestis-Kim's behalf in case no. 95-D-113.

6.    At no time did Respondent notify Jestis-Kim that he had not filed a petition for marital dissolution on her behalf as agreed, but had instead filed a counter-petition for marital dissolution in case no. 95-D-113.

7.    On July 26, 1995, the Circuit Court in case no. 95-D-113 entered an order of marital dissolution along with the assignment of certain marital property.

7

C 44

8. Respondent, as the attorney for the prevailing party in case no. 95-D-113, was required by Rule 7.1(f), of the 6th Judicial Circuit Rules, to submit a final written order to the Circuit Court within 30 days.

9. At no time did Respondent submit a final written order in case no. 95-D-113 within 30 days as required by Rule 7.1(f), of the 6th Judicial Circuit Rules.

10. At no time did Respondent seek leave of the Circuit Court to be excused from Rule 7.1(f), of the 6th Judicial Circuit Rules.

11. At no time after July 26, 1995, did Respondent notify Jestis-Kim that the entry of a final written order in case no. 95-D-113 had been delayed.

12. On March 12, 1996, the Circuit Court in case no. 95-D-113 entered a final Judgment of Dissolution of Marriage.

13. By reason of the conduct described above, Respondent has engaged in the following misconduct:

a. failure to act with diligence and promptness in representing a client in violation of Rule 1.3 of the Illinois Rules of Professional Conduct (1990);

b. failure to keep a client reasonably informed about the status of a matter in violation of Rule 1.4(a) of the Illinois Rules of Professional Conduct;

c. conduct prejudicial to the administration of justice or which brings the courts or legal profession into disrepute in violation of Rule 8.4(a)(5), of the Illinois Rules of Professional Conduct and Supreme Court Rule 771.

## COUNT IV

8

**C45**

(Failure to Cooperate with ARDC)

A. Investigation No. 95-SI-4474 in relation to Donald M.Cisco, Jr.

1.    On September 11, 1995, the ARDC received a communication from Donald M. Cisco, Jr., ("Cisco") regarding Respondent. As a result, the Administrator initiated investigation no. 95-SI-4474.

2.    On September 14, 1995, the Administrator sent a letter to Respondent requesting that Respondent provide a response to Cisco's communication within 14 days.

3.    As of October 11, 1995, Respondent had not responded to the Administrator's request for information.

4.    On October 11, 1995, the Administrator sent a second letter to Respondent requesting that Respondent provide, within 7 days, a response to Cisco's communication.

5.    At no time between October 11, 1995, and October 18, 1995, did Respondent respond to the Administrator's letter dated October 11, 1995.

6.    As a result of Respondent's failure to respond to the Administrator's requests for information related to other various matters including investigation no. 95-SI-4474 , Respondent was personally served a subpoena duces tecum on October 13, 1995, directing him to appear at the Commission's Springfield office on October 26, 1995.

7.    On October 26, 1995, Respondent appeared at the Commission's Springfield office, under subpoena, to give sworn testimony related to various matters including investigation no. 95-SI-4474.

8.    On December 20, 1995, the Administrator sent a letter to Respondent, via Federal

9

Express and telefax, requesting that Respondent provide, within 7 days, documents and additional information related to investigation number 95-SI-4474.

9.    On December 28, 1995, Respondent requested an extension of time to provide the requested additional information and documents as set forth in paragraph 8 above.

10.    On January 5, 1996, the Administrator sent a letter to Respondent, granting him until January 12, 1996, to respond to the Administrator's request for additional information and documents set forth in paragraph 8 above.

11.    As of March 4, 1996, Respondent had not responded to the Administrator's requests for additional information as set forth in paragraph 8.

12.    On March 4, 1996, as a result of Respondent's failure to respond to the Administrator's requests for additional information and documents, Respondent was served a subpoena duces tecum by Federal Express, directing him to appear at the Commission's Springfield office before the Inquiry Board on March 25, 1996.

13.    On March 25, 1996, Respondent appeared before the Inquiry Board of the Commission and requested an additional 14 days to provide all of the requested documents and additional information related to investigation no. 95-SI-4474.

14.    As of May 6, 1996, Respondent had not responded to the Administrator's request for information.

15.    On May 6, 1996, the Administrator sent Respondent an additional letter requesting documents and additional information related to investigation no. 95-SI-4474 and notifying Respondent of his failure to respond to the Administrator's request for information, or to otherwise communicate with the Commission's office.

10

C 47

16.    At no time between May 6, 1996, and May 21, 1996, the date the Inquiry Board voted a complaint against Respondent, did Respondent provide any of the documents or additional information requested by the Administrator as set forth above, or otherwise communicate with the Commission's office.

B.    Investigation No. 95-SI-836 in relation to Carol D. Danbury

17.    On February 10, 1995, the ARDC received a communication from Carol D. Danbury, ("Danbury") regarding Respondent. As a result, the Administrator initiated investigation no. 95-SI-836.

18.    On February 23, 1995, the Administrator sent a letter to Respondent requesting that Respondent provide a response to Danbury's communication within 14 days.

19.    As of March 20, 1995, Respondent had not responded to the Administrator's request for information.

20.    On March 20, 1995, the Administrator sent a second letter to Respondent requesting that Respondent provide, within 7 days, a response to Danbury's communication.

21.    As of March 29, 1995, Respondent had not responded to the Administrator's request for information as set forth above in paragraphs 18 and 20.

22.    On March 29, 1995, as a result Respondent's failure to respond to the Administrator's letters, a subpoena duces tecum was personally served upon Respondent directing his appearance in the Commission's Springfield office and the production of certain documents on April 11, 1995. Respondent was advised by a cover letter, which accompanied the subpoena duces tecum, that a written response would not constitute compliance with the subpoena.

11

C 48

23.     On April 11, 1995, in spite of the Administrator's position that a written response would not constitute compliance with the subpoena described in paragraph 22 above, Respondent, via telefax, provided a written response to the Administrator's request for information. Respondent was informed that he was not excused from the Administrator's subpoena.

24.     On October 26, 1995, Respondent appeared at the Commission's Springfield office, under subpoena, to give sworn testimony related to various matters including investigation no. 95-SI-836.

25.     On December 20, 1995, the Administrator sent a letter to Respondent, via Federal Express and telefax, requesting that Respondent provide, within 7 days, additional information related to investigation no. 95-SI-836.

26.     On December 28, 1995, Respondent requested an extension of time to provide the requested additional information as set forth above in paragraph 25.

27.     Respondent was granted until January 12, 1996, to respond to the Administrator's request for information.

28.     As of March 4, 1996, Respondent had not provided the information requested by the Administrator as set forth in paragraph 25 above.

29.     On March 4, 1996, as a result of Respondent's failure to respond to the Administrator's request for additional information Respondent was served a subpoena duces tecum by Federal Express, directing that he appear at the Commission's Springfield office before the Inquiry Board on March 25, 1996.

30.     On March 25, 1996, Respondent appeared before the Inquiry Board of the

12

Commission, under subpoena, and requested 14 days to provide certain documents and additional information related to investigation no. 95-SI-836.

31.     As of May 6, 1996, Respondent had not responded to the Administrator's request for information.

32.     On May 6, 1996, the Administrator sent Respondent an additional letter requesting documents and additional information related to Investigation 95-SI-836 and notifying Respondent of his failure to respond to the Administrator's request for information, or to otherwise communicate with the Commission's office.

33.     At no time between May 6,1996, and May 21, 1996, the date the Inquiry Board voted the complaint, did Respondent provide any of the documents or additional information requested by the Administrator as set forth in paragraph 25 above, or otherwise communicate with the Commission's office.

     C.     Investigation No. 95-SI-5364 in relation to Johnathon and Ann Morgan

34.     On October 30, 1995, the ARDC received a communication from Johnathon and Ann Morgan, ("Morgans") regarding Respondent. As a result, the Administrator initiated investigation no. 95-SI-5364.

35.     On November 16, 1995, the Administrator sent a letter to Respondent requesting that Respondent provide a response to Morgans' communication within 14 days.

36.     As of December 20, 1995, Respondent had not responded to the Administrator's request for information.

37.     On December 20, 1995, the Administrator sent a second letter to Respondent

C · 5P

requesting that Respondent provide, within 7 days, a response to Morgans' communication.

38. As of March 4, 1996, Respondent had not responded to the Administrator's request for information.

39. On March 4, 1996, Respondent was served a subpoena duces tecum by Federal Express, directing him to appear at the Commission's Springfield office before the Inquiry Board on March 25, 1996, with certain specified documents and information.

40. On March 25, 1996, Respondent appeared before the Inquiry Board of the Commission, under subpoena, and requested an additional 14 days to provide the requested documents and information set forth above in paragraphs 35 and 37.

41. At no time between March 25, 1996, and May 21, 1996, the date the Inquiry Board voted a complaint against Respondent, did Respondent provide any of the documents or information requested by the Administrator as set forth above, or otherwise communicate with the Commission's office.

D. Investigation No. 96-SI-1789 in relation to Solomon Ledbetter

42. On April 5, 1996, the ARDC received a communication from Solomon Ledbetter, ("Ledbetter") regarding Respondent. As a result, the Administrator initiated investigation no. 96-SI-1789.

43. On April 15, 1996, the Administrator sent a letter to Respondent requesting Respondent to provide a response to Ledbetter's communication within 14 days.

44. As of May 6, 1996, Respondent had not responded to the Administrator's request for information.

14

*C· 51*

45.    On May 6, 1996, the Administrator sent a second letter to Respondent requesting
that Respondent provide, within 7 days, a response to Ledbetter's communication.

46.    At no time between April 15, 1996, and May 21, 1996, the date the Inquiry Board
voted a complaint against Respondent, did Respondent provide any information requested by the
Administrator as set forth above, or otherwise communicate with the Commission's office.

E.    Investigation No. 96-SI-1789 in relation to Alice Jestis-Kim

47.    On April 24, 1996, the ARDC received a communication from Alice Jestis-Kim,
("Jestis-Kim") regarding Respondent. As a result, the Administrator initiated investigation no. 96-
SI-2136.

48.    On April 30, 1996, the Administrator sent a letter to Respondent requesting that
Respondent provide a response to Jestis-Kim's communication within 14 days.

49.    As of May 21, 1996, Respondent had not responded to the Administrator's request
for information.

50.    At no time between April 30, 1996, and June 11, 1996, the date the Inquiry Board
voted a complaint against Respondent, did Respondent provide any information requested by the
Administrator as set forth above, or otherwise communicate with the Commission's office.

51.    By reason of the conduct described above, Respondent has engaged in the following
misconduct:

a.    failure to respond to lawful demands for information requested
by the Administrator in violation of Rule 8.1(a)(2) of the Illinois
Rules of Professional Conduct;

b.    conduct prejudicial to the administration of justice, in violation
of Rule 8.4(a)(5) of the Illinois Rules of Professional Conduct;
and

15

C 52

    c.      conduct which tends to defeat the administration of justice or
               which brings the courts or the legal profession into disrepute, in
               violation of Supreme Court Rule 771.

WHEREFORE, the Administrator requests that this matter be assigned to a panel of

the Hearing Board, that a hearing be held, and the panel make findings of fact, conclusions of

fact and law, and a recommendation for such discipline as is warranted.

Respectfully Submitted,

Mary Robinson, Administrator
Illinois Attorney Registration and
  Disciplinary Commission

By:_____

Alix E. Armstead

Alix E. Armstead, Counsel
Attorney Registration and
  Disciplinary Commission
Hilton Offices, Suite 201
700 East Adams Street
Springfield, Illinois 62701
Telephone: (217) 522-6838

C · 53

**E-FILED**
Thursday, 28 December, 2006 02:30:35 PM
Clerk, U.S. District Court, ILCD

BEFORE THE HEARING BOARD
OF THE
ILLINOIS ATTORNEY REGISTRATION
AND
DISCIPLINARY COMMISSION

In the Matter of:                        )
                                         )
JERRY FINNEY,                            )
                                         )    Commission No. 97 SH ᴑᴑ4ᵹ
Attorney-Respondent,                     )
                                         )
No. 00811378.                            )

## COMPLAINT

Mary Robinson, Administrator of the Attorney Registration and Disciplinary Commission,

by her attorney, Peter L. Rotskoff, pursuant to Supreme Court Rule 753(b), complains of Respondent

Jerry Finney, who was licensed to practice law in Illinois on April 23, 1974, and alleges that

Respondent has engaged in the following conduct which tends to defeat the administration of justice

and which brings the courts or the legal profession into disrepute:

## COUNT I

(Neglect and Misrepresentation -- Regina McVey-Dingman)

1.    In or about March, 1994, Respondent agreed to represent Regina McVey-Dingman

("McVey-Dingman") in a dissolution of marriage proceeding. The case was docketed as *McVey v.*
*McVey,* no. 94-D-300, Circuit Court, Macon County, Illinois.

2.    On July 1, 1994, the Court entered an agreed judgment of dissolution, incorporating

a marital settlement agreement. The settlement agreement provided that McVey-Dingman was to

receive $35,323.90, from her ex-husband George McVey's pension fund with General Cable

Corporation.

3.    At no time after the Court entered the order for dissolution of marriage in case no.

94-D-300, did Respondent file a Qualified Domestic Relations Order ("QDRO"), with the Court or

C 54

with George McVey's employer to protect McVey-Dingman's interest in George McVey's pension funds.

4.      In or about February, 1995, McVey-Dingman informed Respondent that George McVey was leaving his employment with General Cable Corporation and intended to receive all of his pension fund proceeds.

5.      In or about April, 1995, McVey-Dingman informed Respondent that the General Cable Corporation had distributed all pension funds directly to George McVey.

6.      On April 24, 1995, Respondent represented to McVey-Dingman, by telefax, that he had filed papers requesting a temporary restraining order preventing the distribution of the pension funds to George McVey.

7.      Respondent's representation to McVey-Dingman as described in Paragraph Six, above, was false and was intended to deceive McVey-Dingman. At no time did Respondent file a temporary restraining order on behalf of McVey-Dingman.

8.      On numerous occasions between April 24, 1995, and at least June, 1995, McVey-Dingman telephoned Respondent's office and left messages requesting that Respondent contact her in relation to case no. 94-D-300.

9.      At no time did Respondent respond to any of McVey-Dingman's telephone calls in relation to case no. 94-D-300.

10.     On March 21, 1996, McVey-Dingman filed a lawsuit against Respondent alleging negligence and breach of contract related to his representation of her in a dissolution of marriage case. The case was docketed as *McVey v. Finney*, case no. 96-LM-348.

11.     On December 19, 1996, the Court entered a default judgment against Respondent in case no. 96-LM-348.

2

C 55

12.    As of May 14, 1997, the date the Inquiry Board voted a complaint against

Respondent, he had not paid any portion of the judgment in case no. 96-LM-348.

13.    By reason of the conduct described above, Respondent has engaged in the following

misconduct:

a.    conduct involving dishonesty, fraud, deceit, or misrepresentation in
violation of Rule 8.4(a)(4) of the Illinois Rules of Professional
Conduct;

b.    failure to keep a client reasonably informed about the status of a
matter and promptly comply with reasonable requests for information
in violation of Rule 1.4 of the Illinois Rules of Professional Conduct;

c.    failure to provide competent representation in violation of Rule 1.1(a)
of the Illinois Rules of Professional Conduct;

d.    failure to act with reasonable diligence and promptness in
representing a client in violation of Rule 1.3 of the Illinois Rules of
Professional Conduct:

e.    conduct that is prejudicial to the administration of justice in violation
of Rule 8.4(a)(5) of the Illinois Rules of Professional Conduct; and

f.    conduct which tends to defeat the administration of justice or to bring
the courts or the legal profession into disrepute in violation of
Supreme Court Rule 771.

## COUNT II

(Neglect and Lack of Communication – Debbie Ooton)

1.    On November 6, 1994, Debbie Ooton (formerly Hoelzen, hereafter "Ooton") filed

a pro se motion to reduce or suspend the $20.00 per week child support payments she had been

ordered to pay her ex-husband, Frank Hoelzen for the care of their child, who was in Frank

Hoelzen's custody. The case had been previously docketed as: *Debbie Hoelzen v. Frank Hoelzen*,

case no. 80-D-708, Circuit Court, Macon County, Illinois.

2.    On or about November 18, 1995, Respondent agreed to represent Debbie Ooton

3

C · 56

in case no. 80-D-708.

3.    On November 18, 1995, Ooton tendered $200.00 to Respondent as attorney fees for his representation.

4.    On November 1, 1995, Respondent entered his appearance on behalf of Ooton in case no. 80-D-708.

5.    On January 2, 1996, the Clerk of the Court scheduled a hearing for January 12, 1996, on Ooten's motion to modify or suspend her child support payments in case no. 80-D-708.

6.    On January 12, 1996, the Court granted Respondent's motion to continue the child support hearing in case no. 80-D-708, over the objections of the attorney representing Hoelzen.

7.    On March 29, 1996, neither Respondent nor Ooton appeared for the hearing in case no. 80-D-708, and, on motion by the attorney representing Hoelzen, the Court entered an order dismissing Ooton's motion to modify or suspend child support.

8.    At no time after March 29, 1996, did Respondent notify Ooton that the Circuit Court, in case No. 80-D-708, had entered an order dismissing the motion to modify or suspend child support.

9.    At no time after March 29, 1996, did Respondent take any action to reinstate the motion to modify or suspend child support in case no. 80-D-708.

10.   On various occasions after March 29, 1996, Ooten left telephone messages requesting that Respondent contact her about the status of case no. 80-D-708.

11.   At no time after March 29, 1996, did Respondent return Ooten's messages or communicate with her concerning case no. 80-D-708.

12.   By reason of the conduct described above, Respondent has engaged in the following misconduct:

4

C-57

a.  failure to act with reasonable diligence and promptness in representing a client in violation of Rule 1.3 of the Illinois Rules of Professional Conduct (1990);

b.  failure to keep the client reasonably informed about the status of a matter in violation of Rule 1.4(a), of the Illinois Rules of Professional Conduct;

c.  conduct prejudicial to the administration of justice in violation of Rule 8.4(a)(4) of the Illinois Rules of Professional Conduct; and

d.  conduct which tends to defeat the administration of justice or bring the courts or legal profession into disrepute in violation of Supreme Court Rule 771.

## COUNT III

(Neglect and Lack of Communication -- Ronald Schafer)

1.  On or about October 15, 1996, Respondent agreed to represent Ronald Schafer ("Schafer") in a post-decree dissolution matter in which Schafer was seeking custody of his two minor children who were in the custody of Schafer's ex-wife.

2.  Respondent and Schafer agreed that Respondent's fee would be $1,000.00, and Schafer paid Respondent $500.00 towards the fee on October 15, 1996.

3.  On various occasions between November 15, 1996, and at least January 15, 1997, Schafer wrote to Respondent and left a number of telephone messages at his office requesting that Respondent return his telephone calls.

4.  At no time did Respondent respond, in any manner, to Schafer's letter or telephone calls as described in Paragraph Three, above.

5.  At no time did Respondent file any pleading on behalf of Schafer.

6.  At no time did Respondent refund any portion of the $500.00 fee which Schafer paid to Respondent.

5

C. 59

7.     By reason of the conduct described above, Respondent has engaged in the following

misconduct:

a.     failure to keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information in violation of Rule 1.4 of the Illinois Rules of Professional Conduct;

b.     failure to act with reasonable diligence and promptness in representing a client in violation of Rule 1.3 of the Illinois Rules of Professional Conduct;

c.     conduct that is prejudicial to the administration of justice in violation of Rule 8.4(a)(5) of the Illinois Rules of Professional Conduct; and

d.     conduct which tends to defeat the administration of justice or bring the courts or legal profession into disrepute in violation of Supreme Court Rule 771.

WHEREFORE, the Administrator requests that this matter be assigned to a panel of the

Hearing Board, that a hearing be held, and that the panel make findings of fact, conclusions of fact

and law, and a recommendation for such discipline as is warranted.

Respectfully submitted,

Mary Robinson, Administrator
Illinois Attorney Registration
and Disciplinary Commission

By:     _____

Counsel for the Administrator

Peter L. Rotskoff, Senior Counsel
Attorney Registration and
  Disciplinary Commission
700 East Adams Street
Hilton Offices #201
Springfield, Illinois 62701
Telephone: (217) 522-6838
S:\WP\PETER\FINNEY2\COMPLAIN.TIP

6

C. 5 9

# Macon County state's attorney dismisses Finney as assistant

By STEPHANIE POTTER
H&R Staff Writer

DECATUR — Macon County State's Attorney Scott Rueter announced Monday the firing of prosecutor Jerry Finney, but declined to elaborate on the reasons behind it.

The dismissal comes about a month after a special prosecutor charged Finney with four misdemeanor counts, alleging that in December he backed his car in the direction of a man trying to repossess it, then drove forward while the man was on the trunk area of the vehicle. Rueter did say that case did not figure in his decision.

"If we're going to give lip service to the idea that someone is innocent until they are proven guilty, we have to live by that," Rueter said.

In April, Tammy Wallace, the mother of a 4-year-old victim in a sexual abuse case, criticized Finney after he failed to file a document elaborating on the charges against her daughter's alleged abuser in the required 30 days.

The state then did not object to a defense motion to dismiss the charges. Rueter said the reasons behind the firing were private because they involve personnel matters. Finney also declined comment, although he has maintained his innocence in the pending criminal case and said he did not mishandle the sexual abuse case. He is set to be arraigned Aug. 13.

Rueter said Finney had successes in the office, including the successful prosecution of four men involved in the July 2001 rape and robbery of a pizza delivery driver.

"Mr. Finney has made significant contributions to our office on occasion," Rueter said. "But on balance, looking at a number of factors, I determined it was best that we sever our relationship."

Budget cuts have left the office short-staffed. The office is three attorneys short, and Rueter said he has two possible applicants in mind.

"We will be able to get by," Rueter said.

Rueter said Finney handled proba-

tion violations and criminal cases, including the prosecution of James L. Huff. Huff is charged with the 1996 murder of his 3-year-old niece, Sara Kramer.

Finney, who formerly served on the Decatur school board, was hired as an assistant state's attorney in August 1999. That was after a five-month suspension of his law license by the Illinois Attorney Registration and Commission. Several clients of the former Macon County public defender accused him of neglecting cases and misleading them about his work.

Stephanie Potter can be reached at spotter@herald-review.com or 421-7984.

IN THE CIRCUIT COURT FOR THE SIXTH JUDICIAL CIRCUIT

MACON COUNTY, ILLINOIS

People of the State of Illinois,   )
                                   )
                  Plaintiff,       )
                                   )
        vs.                        )     No. 94-CF-$42$ )
                                   )
James Delso,                       )
                                   )
                  Defendant,       )

## MOTION TO WITHDRAW AS COUNSEL

NOW COMES Jerry Finney, Public Defender, and moves to withdraw
as counsel for the Defendant, James Delso, and, in support thereof,
states, as follows:

1.    That he is the appointed lawyer for the defendant James
Delso in this cause and in another cause wherein the Defendant is
charged with First Degree Murder.

2.    That he is also appointed to represent a certain witness
in the Murder case who has apparently acted as an informant in the
other case and who expects consideration for his information.

3.    That counsel spoke with the said witness about a number of
matters, including his status as an informant, without knowing
which case he was so acting.

4.    That counsel spoke with the state's attorney's staff about
the witness' case without being advised which case the witness was

C.51

acting as an informant.

5.    That counsel believes this creates an unresolvable conflict of interest such that he must withdraw as counsel for the defendant in all case.

WHEREFORE counsel respectfully requests leave to withdraw.

Respectfully submitted,

James Delso,
Defendant

By: _____
    Jerry Finney
    Public Defender